IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

ASA MOSSMAN, *et al.*,    :
          :  CASE NO.:
          :  1:21-cv-0028-CJW-MAR
          :
     *Plaintiffs*,  :
          :
    v.      :
          :
U.S. CENTERS FOR DISEASE :
CONTROL, *et al.*,    :
          :
     *Defendants*.  :

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

FACTS ........................................................................................................................................ 1

    I.    CDC Issues and Reissues Its Eviction Moratorium Despite Judicial Determinations
        That the Agency Lacks Lawful Authority .............................................................................. 1

    II.   The Plaintiffs Are Irreparably Harmed by CDC's Unlawful Orders' ........................... 6

    III.  The Impact of CDC's Unlawful Order Is Harmful and Unnecessary ....................... 15

ARGUMENT ........................................................................................................................... 17

    I.    The CDC Order Is Without a Statutory or Regulatory Basis .................................... 17

    II.   The CDC Order Denies Plaintiffs Both Their Due-Process Right to Contest Their
        Tenants' Self-Certified Declaration of Financial Hardship and Right to Access the Courts .. 22

      A.   The Right to Contest Self-Certification .................................................................. 22

      B.   The CDC Order Violates Plaintiffs' Right to Access the Courts ........................... 24

    III.  The CDC Order Is Arbitrary and Capricious ............................................................ 29

    IV.  In the Alternative, CDC's Order Violates the Nondelegation Doctrine ................... 32

CONCLUSION ........................................................................................................................ 33

# TABLE OF AUTHORITIES

**Federal Cases**

*Ala. Ass'n of Realtors v. HHW,*
  594 U.S. ___, 2021 WL 3783142 (2021) ...................................................................passim

*Ala. Ass'n of Realtors v. HHS,*
  __ F. Supp. 3d __, 2021 WL 1779282 (D.D.C. May 5, 2021) ................................. 4, 17

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2320 (2021) ..........................................................................................................4

*Ala. Ass'n. of Realtors v. HHS,*
  __ F. Supp. 3d __, 2021 WL 3577367 (D.D.C. Aug. 13, 2021) ............................ 6, 17, 18

*Boddie v. Connecticut,*
  401 U.S. 371 (1971) ...................................................................................................... 26, 28

*Brown v. HHS,*
  4 F.4th 1220 (11th Cir. 2021) ...........................................................................................4

*Capital Fund 85 Ltd. P'ship v. Priority Sys., LLC,*
  670 N.W.2d 154 (Iowa 2003) ..........................................................................................25

*Chambers v. Balt. & Ohio R.R.,*
  207 U.S. 142 (1907) ...........................................................................................................24

*Christopher v. Harbury,*
  536 U.S. 403 (2002) ..................................................................................... 24, 25, 26, 27

*Chrysafis v. Marks,*
  No. 21-1493, 2021 WL 3560766 (Aug. 12, 2021) ...................................................... 23, 24

*Circuit City Stores, Inc. v. Adams,*
  532 U.S. 105 (2001) ...........................................................................................................19

*Connecticut v. Doehr,*
  501 U.S. 1 (1991) ...............................................................................................................23

*DHS v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ......................................................................................................29

*Ebert v. Poston,*
  266 U.S. 548 (1925) ...........................................................................................................21

*Evans v. Offutt,*
  6 Va. Cir. 528, 1978 WL 208147 (Cir. Ct. Arl. Cty. 1978) ...........................................27

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...........................................................................................................17

*Fuentes v. Shevin,*
  407 U.S. 67 (1972) .............................................................................................................23

*Graham v. Barnette,*
  5 F.4th 872 (8th Cir. 2021) ..............................................................................................16

*Gundy v. United States,*
  139 S. Ct. 2116 (2019) ...........................................................................................33

*Harer v. Casey,*
  962 F.3d 299 (7th Cir. 2020) .............................................................24, 25, 27

*Hudson v. Palmer,*
  468 U.S. 517 (1984) ..............................................................................................25

*In re Murchison,*
  349 U.S. 133 (1952) ..............................................................................................23

*In re Operation of Missouri River Sys. Litigation,*
  421 F.3d 617 (8th Cir. 2005) ..............................................................................29

*Kelly v. United States,*
  34 F. Supp. 2d 8 (D.D.C. 1998) .........................................................................30

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986) ..............................................................................................17

*Lecates v. Justice of Peace Court No. 4 of State of Del.,*
  637 F.2d 898 (3d Cir. 1980) ........................................................................26, 28

*Lindsey v. Normet,*
  405 U.S. 56 (1972) ................................................................................................21

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ..............................................................................................22

*McBoyle v. United States,*
  283 U.S. 25 (1931) .........................................................................................19, 21

*McCray v. Maryland,*
  456 F.2d 1 (4th Cir. 1972) ...................................................................................25

*Mistretta v. United States,*
  488 U.S. 361 (1989) ..............................................................................................33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ..........................................................................................29, 31

*New England Coal. On Nuclear Pollution v. NRC,*
  727 F.2d 1127 (D.C. Cir. 1984) ..........................................................................31

*Phillips v. Iowa,*
  185 F. Supp. 2d 992 (N.D. Iowa 2002) ............................................................31

*Pillai v. CAB,*
  485 F.2d 1018 (D.C. Cir. 1973) ..........................................................................31

*Rankin v. Indep. Sch. Dist. No. I-3, Noble Cty., Okl.,*
  876 F.2d 838 (10th Cir. 1989) ............................................................................26

*Skyworks Ltd. v. CDC,*
  2021 WL 911720 (N.D. Ohio Mar. 10, 2021) ................................................19

*Solid Waste Agency v. Army Corp of Eng'rs,*
531 U.S. 159, 172-73 (2001) ............................................................................ 20

*Squaw Transit Co. v. United States,*
574 F.2d 492 (10th Cir. 1978) ......................................................................... 31

*Stanley v. Moore,*
454 S.E.2d 225 (N.C. 1995) ............................................................................. 28

*Terkel v. CDC,*
2021 WL 742877 (E.D. Tex. Feb. 25, 2021) .................................................... 30

*Tiger Lily v. United States HUD,*
__ F. Supp. 3d __, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021) ............... 32

*Tiger Lily, LLC v. HUD,*
5 F.4th 666 (6th Cir. 2021) .......................................................................passim

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,*
140 S. Ct. 1837 (2020) ..................................................................................... 21

*United States v. Bass,*
404 U.S. 336 (1971) ......................................................................................... 21

*United States v. James Daniel Good Real Property,*
510 U.S. 43 (1993) ........................................................................................... 23

*United States v. Warren,*
149 F.3d 825 (8th Cir. 1998) ........................................................................... 21

*Virginia v. Am. Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988) ......................................................................................... 16

*Wayman v. Southard,*
23 U.S. 1 (1825) ............................................................................................... 32

*Wisconsin v. Constantineau,*
400 U.S. 433 (1971) ......................................................................................... 23

*Yates v. United States,*
574 U.S. 528 (2015) .................................................................................... 20, 21

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................. 24

U.S. Const. art. I, § 1 ............................................................................................ 32

**Federal Statutes**

42 U.S.C. § 264 .................................................................................................... 18

42 U.S.C. § 264(a) ..................................................................................... 18, 19, 20

iv

5 U.S.C. § 702 ..................................................................................16

5 U.S.C. § 706(2) ..............................................................................16

5 U.S.C. § 706(2)(A) .........................................................................29

5 U.S.C. § 706(2)(B) ..............................................................22, 24, 31

5 U.S.C. § 706(2)(C) .........................................................................22

Consolidated Appropriations Act of 2021,
  Pub. L. No. 116-260, Title V, § 502, Div. N (2021) .......................3

Coronavirus Aid, Relief, and Economic Security Act,
  Pub. L. No. 116-316 (2020) ...........................................................1


**State Statutes**

Ga. Code § 44-7-14.1 .........................................................................28

Ga. Code § 44-7-55(d) .......................................................................28

IA Code § 562A.27 ............................................................................25

IA Code § 648.1 .................................................................................25

IA Code § 648.22 ...............................................................................25

IA Code § 648.5 .................................................................................25

N.C. Gen. Stat. § 42-25.6 ..................................................................27

N.C. Gen. Stat. § 42-30 .....................................................................27

N.C. Gen. Stat. § 42-36.2(a) .............................................................27

S.C. Code § 27-40-660 .......................................................................28

S.C. Code § 27-40-710 .......................................................................28

S.C. Code § 27-40-760 .......................................................................28

Va. Code § 55.1-1245(f) .....................................................................27

Va. Code § 55.1-1251 .........................................................................27

Va. Code § 55.1-1252 .........................................................................27

Va. Code § 8.01-470 ...........................................................................27

Va. Code § 55.1-1243(a) .....................................................................27


**Rules & Regulatory Materials**

42 C.F.R. § 70.18 .................................................................................3

42 C.F.R. § 70.2 ...........................................................................18, 29

Fed. R. Civ. P. 11 ................................................................................5

April Order,
    86 Fed. Reg. 16,731 (April 1, 2021) ................................................................. 3

August Order,
    86 Fed. Reg. 43,244 (Aug. 3, 2021) ..................................................... 5, 29, 30

February Order,
    86 Fed. Reg. 8,020 (Feb. 1, 2021) .................................................................. 3

June Order,
    86 Fed. Reg. 34,010 (June 1, 2021) ................................................................ 3

September Order,
    85 Fed. Reg. 55,292 (Sept. 4, 2020) ..................................................... 2, 3, 22

**Other Authorities**

Shannon Dunn McCarthy, *Squatting: Lifting the Heavy Burden to Evict Unwanted Company*,
    9 U. Mass. L. Rev. 156 (2014) ..................................................................... 28

Igor Popov, Rob Warnock, and Chris Salviati, *Despite Slight Improvement, Rent Payment Struggles
    Continue*, Apartment List (Sept. 9, 2020) .................................................... 15

*Remarks by President Biden* (August 3, 2021) ......................................................... 5

Antonin Scalia & Bryan Garner,
    Reading Law: The Interpretation of Legal Texts (Thompson/West 2012) ............... 19, 20

*Statement by Press Secretary Jen Psaki* (July 29, 2021) ............................................ 5

Stout Risius Ross, LLC, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing
    Eviction* (last visited Aug. 25, 2021) .......................................................... 15

Terner Center for Housing Innovation, U.C. Berkley, *How Are Smaller Landlords Weathering the
    COVID-19 Pandemic?* (July 2020) ................................................................ 15

## INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56, Plaintiffs move for summary judgment on Counts I-IV and Count VIII of the First Amended Complaint in this matter against Defendants U.S. Centers for Disease Control and Prevention, U.S. Department of Health & Human Services, and Rochelle P. Walensky, Sherri A. Berger, and Xavier Becerra, in their respective official capacities (collectively "CDC").

On Thursday, August 26, 2021, the Supreme Court of the United States removed a stay on an injunction that had been entered in the District Court for the District of Columbia. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. ___, 2021 WL 3783142 (2021) ("*AAR v. HHS*"). In so doing, the opinion of the Court, on a record nearly identical to the one here, stated that "careful review of that record makes clear that the applicants are ***virtually certain*** to succeed on the merits of their argument that the CDC has exceeded its authority." *Id.* at *1 (emphasis added). That opinion further stated, "[t]he applicants not only have a substantial likelihood of success on the merits—it is difficult to imagine them losing." *Id.* at *3.

The issue is so clear, the injury to the plaintiffs so egregious, and the binding precedent so great that the Court should grant summary judgment on the merits, declare the eviction moratorium that is the subject of this suit unlawful *ab initio*, and enjoin it and the issuance of any similar order in the future.

## FACTS

### I.    CDC ISSUES AND REISSUES ITS EVICTION MORATORIUM DESPITE JUDICIAL DETERMINATIONS THAT THE AGENCY LACKS LAWFUL AUTHORITY

On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-316, ("CARES Act") which included in Section 4024 a limited and temporary moratorium on evictions for certain types of federally backed housing that expired on July 24, 2020.

On September 1, 2020, then-Acting CDC Chief of Staff Nina B. Witkofsky issued an order titled, *"Temporary Halt in Residential Evictions to Prevent Further Spread of COVID-19,"* which became effective upon publication in the Federal Register on September 4, 2020. 85 Fed. Reg. 55,292 (Sept. 4, 2020) (the "CDC Order" or "Order").

The Order mandated that "a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order." *Id.* The Order did not apply in any local jurisdiction with similar eviction restrictions. *Id.*

Under the Order, "'Evict' and 'Eviction' means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property. This does not include foreclosure on a home mortgage." *Id.* at 55293. The Order imposed "a fine of no more than $100,000 if the violation does not result in a death or one year in jail, or both, or a fine of no more than $250,000 if the violation results in a death or one year in jail, or both[,]" for any violations. *Id.* at 55296.

The Order applied to "covered persons" who are tenants "of a residential property" who attest that they (1) have "used best efforts to obtain all available government assistance for rent or housing;" (2) "either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020 … (ii) w[ere] not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment [under] … the CARES Act;" (3) are "unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;" (4) they are "using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;" and (5) "eviction would likely render the individual homeless—or force the individual to move into and live in close

quarters in a new congregate or shared living setting—because the individual has no other available housing options." *Id.* at 55,293.

CDC claimed authority to issue the Order under Section 361 of the Public Health Service Act, 42 U.S.C. § 264, and 42 C.F.R. § 70.2. *Id.* at 55,297. It claimed criminal enforcement authority under 18 U.S.C. §§ 3559, 3571, 42 U.S.C. §§ 243, 268, 271, and 42 C.F.R. § 70.18. *Id.* at 55296.

CDC also set out a series of justifications and "findings." *Id.* at 55294-96. Because "[e]victed renters must move," the Order asserted that eviction "leads to multiple outcomes that increase the risk of COVID-19 spread." *Id.* at 55294. It then concluded that "mass evictions" and "homelessness" "would likely increase the interstate spread of COVID-19." *Id.* at 55,295. Thus, then-Acting Chief Witkofsky "determined the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID-19 throughout the United States. [She] further determined that measures by states, localities, or U.S. territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19." *Id.* at 55296.

The Order was initially effective until December 31, 2020, "unless extended." *Id.* at 55,297. After Congress purported to extend the Order from January 1 through January 31, 2021, in a spending bill, *see* the Consolidated Appropriations Act of 2021, Pub. L. No. 116-260, Title V, § 502, Div. N, CDC has reissued its Order repeatedly. On February 3, 2021, CDC extended the Order until March 31, *see* February Order, 86 Fed. Reg. 8,020 (Feb. 1, 2021); then through June 30, *see* April Order, 86 Fed. Reg. 16,731 (April 1, 2021); and then again through July 31, *see* June Order, 86 Fed. Reg. 34,010 (June 1, 2021).

While the Order was still set to expire on July 31, the Supreme Court considered an application to vacate a stay of decision by the U.S. District Court for the District of Columbia, which held that CDC's statutory authority "plainly do[es] not encompass the nationwide eviction moratorium set

forth in the CDC Order." *Ala. Ass'n of Realtors v. HHS*, __ F. Supp. 3d __, <u>2021 WL 1779282</u>, *8 (D.D.C. May 5, 2021) ("*AAR I*").

Although the Supreme Court, without issuing an opinion, declined to vacate the district court's stay of its own order, a majority of the Court agreed that the Order was unlawful. *See Ala. Ass'n of Realtors v. HHS*, <u>141 S. Ct. 2320</u> (2021). Justices Thomas, Alito, Gorsuch, and Barrett would have granted the petitioner's application. Justice Kavanaugh, however, concurred in the denial of temporary relief but explained:

> **I agree with the District Court and the applicants that the Centers for Disease Control and Prevention exceeded its existing statutory authority by issuing a nationwide eviction moratorium**. Because the CDC plans to end the moratorium in only a few weeks, on July 31, and because those few weeks will allow for additional and more orderly distribution of the congressionally appropriated rental assistance funds, I vote at this time to deny the application to vacate the District Court's stay of its order. **In my view, clear and specific congressional authorization (via new legislation) would be necessary for the CDC to extend the moratorium past July 31.**

*Id.* at 2320-21 (emphasis added; citations omitted).

A divided panel of the Eleventh Circuit also decided to leave the CDC Order in place until July 31 despite seeming agreement that the Order is unlawful. *See Brown v. HHS*, <u>4 F.4</u>th 1220, 1222 (11th Cir. 2021), *reh'g pet. pending* (filed August 13, 2021). The panel majority expressed "doubts" about the district court's ruling that the plaintiffs were not likely to succeed on the merits but ruled that the plaintiffs had not made a sufficient evidentiary showing of irreparable harm to sustain a preliminary injunction. *Id.* at 1224; *see also id.* at 1225 ("[D]espite our doubts, we need not consider or resolve the scope of the CDC's statutory authority."). Judge Branch's 60-page dissent there has been vindicated by the Supreme Court's new ruling. *Id.* at 1238 (concluding the "district court abused its discretion in finding that the landlords failed to establish a substantial likelihood of success on the merits of their claim that the CDC Order exceeds statutory authority."). A week later, the Sixth Circuit also agreed,

in a precedential opinion, that the Order is unlawful. *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 668 (6th Cir. 2021).

Given the near judicial consensus that CDC Order is unlawful, the Biden administration conceded that it lacked the authority to issue the order, much less renew it again:

> President Biden would have strongly supported a decision by the CDC to further extend this eviction moratorium[.] Unfortunately, the Supreme Court has made clear that this option is no longer available.

*Statement by Press Secretary Jen Psaki* (July 29, 2021), *available at* https://bit.ly/2VXjzAe.

On August 3, President Biden again spoke to the issue, saying, "Well, look, the courts made it clear that the existing moratorium was not constitutional; it wouldn't stand." *Remarks by President Biden* (Aug. 3, 2021), *available at* https://bit.ly/3gcki7h. He continued, "The bulk of the constitutional scholarship says that [a new Order is] not likely to pass constitutional muster. … But the present— you could not—the Court has already ruled on the present eviction moratorium." *Id.* Nevertheless, the President suggested CDC might issue a new order, but "[w]hether that option will pass constitutional measure with this administration, I can't tell you. I don't know. … But, at a minimum, by the time it gets litigated, it will probably give some additional time[.]" *Id.*[1]

Later that same day, CDC issued a new extension of the Order, yet again invoking § 264, remaining in effect until October 3, 2021. *See* August Order, 86 Fed. Reg. 43,244 (Aug. 3, 2021). President Biden would later explain his reasoning for issuing the dubious Order: "And I went ahead and did it, but here's the deal: I can't guarantee you the Court won't rule [] we don't have that authority, but at least we'll have the ability, if we have to appeal, to keep this going for a month at least—I hope longer than that." *Remarks by President Biden* (Aug. 5, 2021), *available at* https://bit.ly/2VVg7Gj.

---

[1] Maintaining a suit solely for purposes of delay is, among other things, a violation of Federal Rule of Civil Procedure 11. *See* Fed. R. Civ. P. 11(b)(1).

The newly extended moratorium "differs from its predecessor in that it applies only 'in the U.S. count[ies] experiencing substantial or high levels or community transmission of SARS-CoV-2 as defined by CDC." *Ala. Ass'n. of Realtors v. HHS*, __ F. Supp. 3d __, 2021 WL 3577367, at *2 (D.D.C. Aug. 13, 2021) ("*AAR II*") . As the District Court for the District of Columbia explained, "the current eviction moratorium is an extension" of the four prior iterations of CDC's Order. *Id.* at *3-4. The Supreme Court was equally blunt: "Apart from slightly narrowing the geographic scope, the new moratorium is indistinguishable from the old." *AAR v. HHS,* 594 U.S. ___, 2021 WL 3783142 at *2.

## II.   THE PLAINTIFFS ARE IRREPARABLY HARMED BY CDC'S UNLAWFUL ORDERS[2,3]

All of the Plaintiffs moving for summary judgment in this action own residential rental property affected by the Eviction Moratorium and CDC Order, or they are membership organizations that do. App'x at 1, 3, 5, 8, 10, 12, 13, 15, 17, 26, 28, 38, 33, 35, 38, 40, 43, 46.

Plaintiff National Association of Residential Property Owners ("NARPM") is a member organization representing 5,816 residential property managers nationwide, at least 8 of these members are in Iowa. App'x 1 ¶¶ 1, 3. These members have the right to evict non-paying tenants under state law, including the law of Iowa. *Id.* ¶ 3. Some of the tenants of NARPM members have submitted the statement recommended by the CDC Order and that has prevented courts, including Iowa courts, from evicting them. *Id.*

The National Apartment Association ("NAA") is a membership trade association of owners and managers of rental housing. App'x at 3 ¶ 1. NAA is a trade association comprising 155 state and

---

[2] Plaintiffs in this matter have submitted Declarations demonstrating their injuries that are available in the Appendix submitted herewith in accordance with LR 56(e).

[3] The Declarations of Harold Schoeffler, Hella Shriver, and Grant J. Anderson are unsigned because of the demanding expedited briefing schedule. Undersigned counsel expects to substitute signed declarations on the docket shortly or, alternatively, will withdraw the statements relying on those unsigned Declarations.

local affiliated apartment associations and over 85,000 members managing more than 10.5 million rental homes across the U.S. including in Iowa. *Id.* ¶ 2. Many of NAA's members have provided habitable premises to tenants, have not been paid rent, are entitled to writs of possession and eviction against tenants, but the CDC Order prevents them from obtaining and executing those writs. *Id.* ¶ 3. NAA's members are losing billions of dollars in uncollected rents from tenants who are likely insolvent, so the members possess no realistic monetary remedy. *Id.* ¶ 3. Accordingly, the inability to evict because of the CDC Order irreparably harms NAA members who cannot access their properties by eviction. *Id.* at 3-4 ¶¶ 3-4.

Asa Mossman is a resident of Cedar Rapids Iowa. After his tenant defaulted on his rent obligation, Mr. Mossman obtained a judgment of eviction in Linn County, Iowa Court. App'x at 5 ¶¶ 2-3. The tenant then signed the CDC Order's statement that they made less than $99,000 a year, would make best efforts to pay and are unable to pay and that was enough to stop eviction in Iowa court. The stay was renewed each time the Defendants reissued the CDC Order and even continued after the lease had expired. *Id.* at 5-6 ¶¶ 4-7. Mr. Mossman would have evicted the tenant, but the CDC Order prevented eviction; the tenant eventually abandoned the property voluntarily in May 2021. *Id.* at 6 ¶¶ 6-8. Mr. Mossman is owed over $5,000 in uncollectible rent and the existence of the CDC Order and Defendants' claimed powers have completely altered his willingness to rent his property and the conditions under which he is willing to do so. *Id.* ¶¶ 9-10.

The CDC Order and Defendants' claimed powers have caused Mr. Mossman to place more restrictions not only on that properties' lease but also on other properties that he owns. The restrictions include (i) limiting the tenants to which he rents, (ii) *doubling* the security deposit required, and (iii) evicting tenants more readily for cause whenever the opportunity arises. *Id.* ¶ 11. Mr. Mossman fears loss of his property rights and access to his property, including the eviction remedy.

For he has experienced firsthand the fact that if his tenants merely fill out the CDC Order's form, his tenants can prevent eviction at the drop of a hat. *Id.* ¶ 12.

Winston Tracy Mills is a residential property owner in South Carolina. Until July 2021, he had a tenant who was not paying rent on a lease that expired in May 2020 and, despite being owed $24,000 in back rent, he could not evict the tenant nor, due to insolvency, enforce a judgment of eviction against that tenant. App'x at 8-9 ¶¶ 2-4.

Amanda Fletcher is a residential property owner in New Jersey. Her tenant was in default to the tune of more than $43,000 but rental assistance has allowed her to remain in default "only" $16,000 at present. App'x at 10 ¶ 2. Ms. Fletcher's tenant is relying on the New Jersey Governor's moratorium order "backstopped" by the CDC Order to attempt to extort Ms. Fletcher for a payment of $3,700 plus debt forgiveness of $12,000 in exchange for the tenant vacating the property. Despite this, Ms. Fletcher still could not evict this brazen tenant even if she reneged on vacating the property after Ms. Fletcher met her extortionate demands and paid the tenant thousands of dollars to leave. *Id.* at 11 ¶¶ 5-6. Ms. Fletcher's experience shows how the CDC's Order has destroyed the ordinary landlord-tenant relationship.

Chris and Tomika Allen are residents of Stonecrest, Georgia and own a residential property in default in Fulton County Georgia where the tenant is more than $5,000 behind on rent. App'x at 12 ¶ 1-3. The Allens attempted to evict the tenant on February 28, 2021. The tenant filled out the CDC form in her submission to the Court and the Georgia Court prevented the Allens from challenging those assertions. *Id.* ¶ 4. Even after agreeing to an amount in mediation, the tenant still failed to pay and appears insolvent, but the Allens cannot evict because of the CDC Order. *Id.* ¶ 5.

Dan Wagenmaker is President of Millstone Properties, Inc. ("Millstone"), an Illinois company and a Plaintiff in this case. Millstone owns rental property in Chicago, Illinois. App'x at 13 ¶ 1-2. Millstone owned rental property in Chicago. The tenant was on a month-to-month lease but stopped

paying rent in September of 2019. It took until January 2020 to get an order of eviction. The Sheriff was not to evict until March 2020 but that's when the pandemic hit. The Illinois Governor's moratorium order backstopped by the CDC order prevented eviction until July 21, 2021, when the tenant was evicted for cause. *Id.* at 13-14 ¶¶ 3-4. Despite the tenant owing approximately $37,000 in back rent, the tenant is likely insolvent and so money damages are not available to Millstone. The very existence of the CDC Order encouraged the tenant not to pay or mitigate Millstone's losses by vacating the premises. *Id.* at 14 ¶ 4.

Denis and Roseanne Norton are residents of Cedar Point, North Carolina and own ten units of rental property, two of which are in default. App'x at 15, ¶¶ 1-2. The Norton's would evict the tenants if they could. *Id.* The sole reason the Nortons have not evicted is that their tenants have made the recitations the CDC Order requires that they make less than $99,000 a year, have been economically impacted by Covid-19, and are paying all they can. The court will not test these assertions. *Id.* at 15-16 ¶ 3. While North Carolina had its own eviction moratorium until January 31, 2021, the tenants now rely solely on the CDC Order. *Id.* at 16 ¶ 4. Their inability to pay any money in rent makes recouping back rent unlikely. *Id.*

Plaintiffs Emanuel and Jessica John are residents of Casper, Wyoming and own a residential property in Breaux Bridge Louisiana. App'x at 17 ¶¶ 1-2. The tenants had not paid rent since September 2020 and now owe more than $15,000 dollars. *Id.* ¶ 3-4. When the Johns brought eviction proceedings, the tenant recited the CDC Order boilerplate that he made less than $99,000 a year, was unable to pay because of Covid-19, and would pay as best he could. The courts of Louisiana would not allow the Johns to test those declarations. *Id.* at 17-18 ¶¶ 4-5.

Recently, Mr. John's attorney presented evidence that the tenant was destroying the property and tried to evict him on those grounds. But that lawyer came down with Covid-19 and Mr. John had to drive 24 hours from Wyoming to Louisiana to represent himself. *Id.* at 18 ¶¶ 6-8. On August 25,

2021, the Court evicted the tenant for cause and Mr. Johns was able to access his property once more, which was in ruins. There were *three, 16-foot trailers of trash* he had to clear out. Mr. John's declaration attaches the destruction allowed by the CDC Order because he could not remove the tenant for failure to pay rent for nearly a year. *Id.* ¶¶ 9-10. The Johns cannot risk renting the property again while Defendants still claim the authority to impose future moratoria and may have to sell the property. *Id.* ¶ 10, 12. Fixing the damage that could have been prevented had the CDC Order not been entered will cost the Johns over $15,000. *Id.* ¶ 11.

Grant J. Anderson is a residential property owner and a resident of Indiana. He owns two properties, both currently in default over $15,000. App'x at 26 ¶¶ 1-3. At least one of the tenants has explicitly relied on the CDC Order recitations to stay on the property, and Indiana courts will allow Mr. Anderson to test those assertions. *Id.* ¶ 3. Mr. Anderson is being kept off of his property by the CDC Order. *Id.* at 27 ¶ 4.

Harold and Sarah Schoeffler are both residents of Louisiana and owners of Harold and Sarah Schoeffler Real Estate Holdings Co., LLC ("Schoeffler Real Estate"), a Louisiana company and a Plaintiff in this case. App'x at 28 ¶ 1. The tenants of the residential property held by Schoeffler Real Estate are in default, have not paid rent since June 2020, and owe more than $8,000. *Id.* ¶¶ 2-3. The Schoefflers' tenant is relying on the CDC Order to resist eviction under Louisiana law and has brandished the CDC Order in an eviction proceeding in Louisiana state court on October 13, 2020. The Schoefflers could not test the declaration; the tenant's mere production of it kept the Schoefflers out of court. *Id.* at 29 ¶ 4. If the tenant's assertions are accurate, the tenant is likely insolvent and resort to a money judgment would be fruitless. *Id.* at 29 ¶ 5.

Plaintiff Hella Shriver is a resident of Jackson County, Missouri and owns residential property in Independence, Missouri, doing business as HS Properties. Plaintiff has rented to two tenants since October 2019 for $795 a month. App'x at 30 ¶¶ 1-2. The tenants have often paid rent late and

sometimes not at all. Indeed, they have paid no rent since August 2020 and owe Ms. Shriver thousands of dollars in rent, legal fees, and court costs in Missouri for the actions against them. *Id.* ¶¶ 3-4. Ms. Shriver provided a formal demand for rent and notice of vacation of property under Missouri law in September 2020. She then brought a writ of possession in the 16th Judicial Circuit Court in Jackson County, Missouri. At that hearing the tenants trotted out the CDC recitation that they made less than $99,000 a year, were unable to pay because of the economic stresses of Covid-19, and had used best efforts to obtain government assistance and make partial payments. The court did not allow Ms. Shriver to test the tenants' allegations and dismissed the case without prejudice to refiling once the CDC Order expired in January 2021. *Id.* at 31 ¶¶ 5-6. As the Order remains in effect, Ms. Shriver was not allowed further action. *Id.* ¶ 7. She believes that if the declarations by her tenants are accurate they are insolvent and she cannot collect a judgment against them. *Id.* ¶ 8.

Plaintiff Jason Sudia is a resident of New Jersey with two residential rental properties in New Jersey that are in default on rent in excess of $10,000, but the tenants have declared they will not pay any rent while any moratorium is in effect. App'x at 33-34 ¶¶ 1-2. Mr. Sudia would evict if he could, but the New Jersey Governor's order prevents eviction and any challenge to the state order is fruitless as long as it is backed by the CDC Order. *Id.* at 34 ¶ 3. The tenants are likely insolvent and so any redress monetarily is unlikely. *Id.* ¶ 4.

Kendra Kessinger is a resident of Kentucky and the principal of Plaintiff Titans Creek, LLC, an Kentucky company, which rents residential property in Kentucky. App'x at 35 ¶¶ 1-2. Plaintiff has 13 tenants in default and 17 who say they are protected from eviction by the CDC Order. Some have filed CDC Order "forms" and others have mouthed the forms' concepts orally in court. *Id.* ¶¶ 2-3. The inability to evict for failure to pay rent has allowed at least one tenant to practically destroy the property before leaving. Titans Creek is also owed over $51,570 in back rent, which the tenants, likely insolvent, are unable to pay. *Id.* at 36 ¶¶ 5-6. The CDC Order has forced Titans Creek to seek

to sell many of the properties. But because Plaintiff still cannot evict a tenant for non-payment of rent, it cannot sell all its properties to exit the rental business. *Id.* ¶ 7.

Plaintiff Rhett E. Butler, Jr. is the owner and principal of Butler Plantations, LLC ("Butler Plantations"), a Plaintiff in this case. Butler Plantations is a company organized under the laws of Georgia. App'x at 38 ¶¶ 1-2. Butler Plantations owns 12 rental properties and has 3 tenants in default over $20,000 but cannot evict because of the CDC Order. *Id.* ¶ 2. The tenants filed the required CDC Order recitation in the Georgia state court when Butler Plantations filed for eviction. This stopped the proceedings with no chance for Butler Plantations to contest the statements. *Id.* ¶¶ 2-3. Nonetheless, Butler Plantations has not been divested of its own obligations and thus must continue to pay taxes and other upkeep. A tax lien has been placed on the property because the rental income is being denied it by the CDC Order. *Id.* at 38-39 ¶¶ 4-5. The defaulting tenants are likely insolvent and there is only a chimerical hope of monetary recovery. *Id.* at 39 ¶ 6.

Plaintiff Richard McConkie is a resident of Virginia but is temporarily stationed in Japan. While abroad, he is renting out his own home in Virginia. App'x 41 ¶¶ 1-2. Mr. McConkie is currently owed $4,200 of unpaid rent, after deducting the amount Mr. McConkie was able to obtain through Virginia's rental assistance program. *Id.* ¶ 3. Mr. McConkie would like to evict whether or not he is paid the back rent, but he cannot because of the CDC Order. *Id.* ¶¶ 5-6.

Mrs. Shradha "Simi" Kanak, a Florida resident, is the principal of Plaintiffs 7M apartments LLC and 7M Real Estate LLC (collectively, "7M"), which own rental apartment buildings with 93 and 40 units respectively. App'x at 43 ¶¶ 1-2. Both apartment buildings have **dozens** of tenants in default. Prior to July 31, 2021, as many as 36 tenants parroted the CDC Order statements that prevented them from being evicted. Mrs. Kanak believes many were falsely submitted, but just submitting them was enough to prevent eviction in the Florida Courts. *Id.* ¶¶ 2-4. Most of these tenants are nine months in arrears in rent and eligible for eviction under Florida law. Despite Florida's rental assistance

program, 7M is routinely out hundreds of thousands of dollars in rent. Attempts to sell the apartments have been unavailing because the CDC Order has damaged the apartments' market value. *Id.* at 43-44 ¶¶ 5-6.

Moving quickly between July 31 and August 3, 2021, before the most recent CDC Order was reinstated, 7M was able to evict some tenants, but the Florida courts again stayed writs of possession upon the reinstated CDC Order. *Id.* at 44 ¶¶ 7-8. One of those tenants under eviction was granted a stay to October 3, 2021, even though he owes $4,030 in back rent. *Id.* ¶ 9. Just days before this motion was filed, on August 26, 2021, another tenant owing $2,882.48 in unpaid rent submitted the CDC Order declaration. *Id.* ¶10. The Florida state courts allow no chance to test the CDC Order statements by tenants. *Id.* ¶ 11.

Plaintiffs Susan and Steve Harrison are residents of South Carolina and co-owners of an IRA run by Equity Trust Co., which owns residential rental property in Berkley County, South Carolina. App'x at 46 ¶¶ 1-2. The Harrisons' tenants of that property are in default and have not paid their $1,200 monthly rent since November 2020. *Id.* ¶¶ 3-4. The tenants are aware of the CDC Order, claim to satisfy its requirements, and are simply not paying. Any resort to the courts would be fruitless given the CDC Order. *Id.* at 47 ¶¶ 5-7. The tenants are likely insolvent and so the Harrisons are unlikely to obtain a payment of damages. *Id.* ¶ 6.

Absent an Order declaring the CDC Order unlawful and enjoining its enforcement and the issuance of any similar order in the future, all the moving Plaintiffs and their members will be irreparably injured by a permanent reduction in their properties' value and the ever-present threat that Defendants may deprive them of their access to those properties and to their local state courts. App'x at 2 ¶ 4; 6-7 ¶ 13; 9 ¶ 5; 11 ¶¶ 7-8; 12 ¶ 6; 14 ¶¶ 5-6; 16 ¶ 5; 19 ¶¶ 13-15; 27 ¶ 5; 29 ¶ 6; 31 ¶¶ 9-11; 34 ¶¶ 5-6; 36-37 ¶¶ 7-9; 39 ¶ 7; 41-42 ¶¶ 7-9; 44-45 ¶¶ 13-15; 47 ¶¶ 8-10.

Yet nothing, in even the most recent CDC Order, distinguishes among tenants who are vaccinated or those who have already had the disease and developed natural immunity through antibodies in their recovery.

There are currently an estimated 43,811,786 renter-occupied housing units in the United States. Approximately 86% of those units are occupied by tenants with annual household incomes below $100,000. Recent studies have estimated that because of the economic downturn associated with COVID-19 and associated federal, state, and local responses to fears of the disease, there will be a nationwide shortfall of rental payments over the next four months mounting up to the *staggering* sum of $21,545,000,000. Stout Risius Ross, LLC, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction* (last visited August 25, 2021), *available at* https://bit.ly/3DlM2k6.

In a recent national survey, more than half of small landlords reported that they had at least one tenant not pay rent that month. *See* Terner Center for Housing Innovation, U.C. Berkley, *How Are Smaller Landlords Weathering the COVID-19 Pandemic?* (July 2020), *available at* https://bit.ly/2WgU8tz.

More than half of landlords reported that rent collections are down from the first quarter of 2020, with 30% of respondents saying they are down more than 25%. *Id.* One-quarter of all respondents had to borrow funds to cover shortfalls in operating costs. *Id.* Moreover, nearly 40% of respondents lacked confidence "in being able to cover their operating costs over the next quarter," even *without* restrictions on evictions. *Id.*

One-third of renters nationwide already owed back rent in September 2020 when CDC first issued its Order. *See* Igor Popov, Rob Warnock, and Chris Salviati, *Despite Slight Improvement, Rent Payment Struggles Continue*, Apartment List (Sept. 9, 2020), *available at* https://bit.ly/2XNmhZq.

Moreover, only about one-third of all renters "made an on-time rent payment in the first week of September [2020]." *Id.* In the end, the study estimated that 10% of tenants would not pay any that month. *Id.*

## III. THE IMPACT OF CDC'S UNLAWFUL ORDER IS HARMFUL AND UNNECESSARY

As of August 30, 2021, according to records kept by Defendant CDC, 204.4 million Americans have had at least one dose of a Covid-19 vaccine, and 173.5 million Americans are fully vaccinated. *COVID Data Tracker*, CDC (last checked August 30, 2021), *available at* https://bit.ly/3k0U6xM. According to the CDC, almost 62% of the American population has been vaccinated to some degree, with such vaccinations concentrated in the most vulnerable populations, and over 52% of the country is fully vaccinated, with those vaccinations also concentrated among the most vulnerable. *Id.* Yet nothing, in even the most recent CDC Order, distinguishes among tenants who are vaccinated or those who have already had the disease and developed natural immunity through antibodies in their recovery.

CDC's Order prevented most Plaintiffs and the thousands of members of Plaintiffs NAA and NARPM from using lawful eviction procedures for over a year, which will cost its members millions of dollars in unrecoverable losses. Plaintiffs will be unlikely to obtain any economic relief or damages from their tenants once the CDC Order (purportedly) expires on October 3, 2021, because, by definition, any tenant presenting an appropriate attestation will be insolvent. Plaintiffs will lose millions of dollars in uncollected rents, while expending huge sums for maintenance and costs. Many Plaintiffs are unlikely to recover from the economic stress caused by CDC's Order.[4] Plaintiffs only opportunity to mitigate their losses will be from ousting their tenants who are in wrongful possession

---

[4] Two plaintiffs Helen Fitzgerald and Regina Tilman have sold their property entirely because of the CDC Order.

of the premises—which is the very reason eviction was created and has so long persisted as an equitable remedy in the first place.

## STATEMENT OF JURISDICTION & STANDARD OF REVIEW

A plaintiff can raise a pre-enforcement challenge to a criminal restriction when they can tie economic harm to government action and there is a realistic threat of enforcement. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them.").

The Administrative Procedure Act ("APA") entitles "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... to judicial review thereof." 5 U.S.C. § 702. The APA requires courts to set aside agency action that is rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2).

Under Rule 56 of the Federal Rules of Civil Procedure, a court should grant summary judgment "if, when viewing the facts in the light most favorable to the nonmoving party, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Graham v. Barnette*, 5 F.4th 872, 881 (8th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute exists only if "a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted).

**ARGUMENT**

## I.  THE CDC ORDER IS WITHOUT A STATUTORY OR REGULATORY BASIS

Before the Supreme Court ruled in *AAR v. HHS*, most courts had already determined the CDC Order was unlawful for a host of reasons.  Now there is no doubt.  The Supreme Court has approved the district court's reasoning in *AAR v. HHS*, stating:

> The District Court produced a comprehensive opinion concluding that the statute on which the CDC relies does not grant it the authority it claims.  The case has been thoroughly briefed before us—twice.  And a careful review of that record makes clear that the applicants are virtually certain to succeed on the merits of their argument that the CDC has exceeded its authority.  It would be one thing if Congress had specifically authorized the action that the CDC has taken.  But that is not what happened.  Instead, the CDC has imposed a nationwide moratorium on evictions in reliance on a decades-old statute that authorizes it to implement measures like fumigation and pest extermination.  **It strains credulity to believe that this statute grants the CDC the sweeping authority it here asserts.**

*AAR v. HHS*, 021 WL 3783142, at *1 (emphasis added).

CDC is a creature of statute that "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  CDC's authority to regulate, then, "must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

Judge Dabney Friedrich's two decisions on this matter are entitled to great respect, as the matter has now gone up to the Supreme Court twice with a majority twice agreeing with her ruling on the merits of the law.  In *AAR I*, the Court granted summary judgment because the words of the statute could not possibly be as expansive as Defendants claimed and because the assertion that Congress had somehow ratified the action was inaccurate and untrue given the language of the statute. 2021 WL 3577367 at *6, 8, 9.  In *AAR II*, the court addressed the "new" CDC moratorium that extends to October 3, 2021.  Once again, the court's view is extremely persuasive, as it has been upheld by the Supreme Court.  First, the court ruled that the current eviction moratorium is an extension of all the others and not a new policy. *Id.* at *4.  Second, it is as *ultra vires* as all the previous ones. *Id.* at

*6. Had it not been that the district court was bound by the D.C. Circuit's prior erroneous ruling, she would have vacated the stay on her injunction. *Id.* at *6 n.3. Judge Friedrich's decision has now been vindicated by the Supreme Court.

As purported authority for its Order, CDC relies on 42 U.S.C. § 264 (and 42 C.F.R. § 70.2, in turn). But "[t]hat text does not grant the CDC the power it claims." *Tiger Lily*, 5 F.4th at 669. The statutory authority on which CDC relies does not grant the agency the broad authority to prohibit state-court evictions and unilaterally void state laws across the country. Section 264(a) says that the Surgeon General may "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from … one State or possession into any other State or possession." 42 U.S.C. § 264(a). And, in particular, the statute allows for "such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary."[5] *Id.*

Principles of statutory construction require courts "to interpret the scope of the grant of rulemaking authority in the first sentence of § 264(a) by reference to the means it authorizes in the second." *Tiger Lily*, 5 F.4th at 670. The traditional canons such as *ejusdem generis*, *expressio unius*, *noscitur a sociis*, and *casus omissus* show that CDC lacks the authority to issue the Order. *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts, 93-100, 107-11, 174-79, 195-213 (Thompson/West 2012). These canons show that the link between the relevant federal statutes

---

[5] The regulation, in turn, allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection" when she "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession[.]" 42 C.F.R. § 70.2.

and CDC Order is too weak and attenuated to allow CDC to lawfully deprive Plaintiffs of state-court eviction processes.

The second sentence of Section 264(a) limits the CDC's regulatory authority to the "provi[sion] for such inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles," 42 U.S.C. § 264(a), all of which are far afield from *eviction procedures under state law*. As the Sixth Circuit has recognized already, "the second sentence narrows the scope of the first," by listing "how the Secretary might enforce regulations that are, in his judgment, 'necessary to prevent the introduction, transmission, or spread of communicable diseases." *Tiger Lily*, 5 F.4th at 670 (quoting 42 U.S.C. § 264(a)); *see also Skyworks Ltd. v. CDC*, 2021 WL 911720, at *9 (N.D. Ohio Mar. 10, 2021) ("With this language, Congress directs the agency to act on specific animals or articles which are themselves infected or a source of contagion that present a risk of transmission to other people."). The Supreme Court has decisively come down on the side of this view of the statute. *See AAR v. HHS,* 2021 WL 3783142, *1-2.

Under the *ejusdem generis* canon, both provisions must be limited to actions taken in keeping with these examples. *See, e.g., Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 115 (2001) ("contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" held to include only transportation workers in foreign or interstate commerce); *McBoyle v. United States*, 283 U.S. 25, 26, 27 (1931) ("automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" held not to apply to an airplane). Voiding state-eviction laws, of course, bears no relationship to "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles," and thus would extend the term "other measures as … may be necessary" far beyond any rational reading. "Applying the *ejusdem generis* canon of statutory construction, the residual phrase in the second sentence of § 264(a)—which allows the Secretary to take 'other measures' he deems necessary to stop the spread

of disease—encompasses measures that are similar to inspection, fumigation, destruction of animals and the like." *Tiger Lily*, 5 F.4th at 671.

*Expressio unius*, or the negative-implication canon, supports the same result. This canon has greater force the more specific a statutory enumeration. Scalia & Garner at 108. Here, the enumeration in 42 U.S.C. § 264(a) is so specific to the types of ways to stop the "spread of communicable diseases" that the more general phrase ("and other measures, as in his judgment may be necessary") is limited to the narrow scope of the specifics that precede it. Nor can the regulation's reference to "reasonably necessary" measures extend to CDC's Order. Evictions, property law, landlord-tenant law, and law relating to non-impairment of contracts are well beyond the genus of the enumeration in § 264(a) and, therefore, CDC has no power to issue the eviction moratorium challenged here.

*Noscitur a sociis*, or the associated-words canon, also instructs that the words in a list are associated and have a similar meaning. Scalia & Garner at 195; *Yates v. United States*, 574 U.S. 528, 544 (2015) ("'Tangible object' is the last in a list of terms that begins 'any record [or] document.' The term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents, *i.e.*, objects used to record or preserve information."). Similarly here, "any other measures" is appropriately read to refer, not to *any* measures such as eviction moratoriums but only to a subset of measures similar to those enumerated: "inspection, fumigation, disinfection," and so forth.

CDC's expansive reading of "other measures" would impermissibly allow the agency "to insert itself into the landlord-tenant relationship without clear textual evidence of Congress's intent to do so." *Tiger Lily*, 5 F.4th at 671. Such a reading violates "the principle that 'Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority.'" *Id.* (quoting *Solid Waste Agency v. Army Corp of Eng'rs*, 531 U.S. 159, 172-73 (2001)). This limiting

principle of statutory construction "has yet greater force when 'the administrative interpretation alters the federal-state framework by permitting federal encroachment upon traditional state power," like landlord tenant relations." *Id.* (citing *Lindsey v. Normet*, 405 U.S. 56, 68 (1972) ("The Constitution has not federalized the substantive law of landlord-tenant relations.")). The Supreme Court cited this case in its *per curiam* opinion stating, "The moratorium intrudes into an area that is the particular domain of state law: the landlord tenant relationship." *AAR v. HHS,* 2021 WL 3783142 at *3. Absent "'exceedingly clear language'" that Congress intended for CDC "to supersede state landlord-tenant law[,]" there is no authority for CDC to do so. *Lindsey*, 405 U.S. at 68 (quoting *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020)). *See also Ebert v. Poston*, 266 U.S. 548, 554 (1925) (explaining that *casus omissus*, or the omitted-case canon, instructs courts not to supply "judicial legislation" when faced with a statutory omission).

Because CDC's Order creates substantive criminal penalties, the rule of lenity requires that any statutory ambiguity be construed against the government, in favor of leniency. *See Yates*, 135 S. Ct. at 1088. Lenity is a traditional rule of construction that "generally requires that doubts be resolved in favor of a defendant where there is ambiguity in a criminal statute." *United States v. Warren*, 149 F.3d 825, 828 (8th Cir. 1998). The rule ensures both due process and the separation of powers. Lenity "embodies 'the instinctive distaste[] against men languishing in prison unless the lawmaker has clearly said they should." *United States v. Bass*, 404 U.S. 336, 347 (1971) (citation omitted). The rule ensures that a law gives "fair warning … to the world in language that the common will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle*, 283 U.S. at 27. Lenity also protects the separation of powers by limiting to Congress the legislative task of criminalizing conduct and setting the corresponding punishment. *Bass*, 404 U.S. at 348.

If the text of § 264(a) allowed for an eviction moratorium, CDC could consolidate both legislative and executive functions in a single branch and create new criminal law where none existed before. Indeed, CDC is explicit that those who violate the Order face criminal consequences, including up to a year in prison and hundreds of thousands of dollars in fines. 85 Fed. Reg. at 55,296. But processing evictions under state law is undoubtedly a lawful exercise of the states' legislative judgment. And it is certainly not *criminal* in the eyes of Congress. Vesting unilateral authority to say otherwise and imprison citizens for *following state law* based on the thinnest reed of being assertedly "necessary" for disease control violates lenity. This Court should not sanction such outrageous conduct by a federal agency.

In short, CDC's Order cannot be justified by its statutory source. This Court must "hold unlawful and set aside" CDC's action because it is "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

## II. THE CDC ORDER DENIES PLAINTIFFS BOTH THEIR DUE-PROCESS RIGHT TO CONTEST THEIR TENANTS' SELF-CERTIFIED DECLARATION OF FINANCIAL HARDSHIP AND RIGHT TO ACCESS THE COURTS

### A. The Right to Contest Self-Certification

The APA also requires courts to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). As the Plaintiffs' Statement of Fact Not at Issue clearly demonstrates, courts across the land do not allow the CDC Order declarations to be challenged. *See, e.g.*, Statement of Facts ¶¶ 45, 49, 54, 57, 60, 71, 83. They are "get out of court free" cards.

The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person hall … be deprived of life, liberty, or property, without due process of law[.]" This clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests[.]" *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

At its foundation, due process requires an "opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (cleaned up). The procedural rules that enforce this constitutional right "are shaped by the risk of error inherent in the truthfinding process[.]" *Id.* at 344. "[F]airness can rarely be obtained by secret, one-sided determination[s] of facts decisive of rights." *Connecticut v. Doehr*, 501 U.S. 1, 14 (1991).

The CDC Order violates the Plaintiffs' right to due process because it denies them an opportunity to be heard when their tenants self-certify the CDC's declaration of financial hardship. Without a procedural safeguard to ensure that their tenants truly cannot pay even $1 in rent and will become homeless if evicted, the Plaintiffs lack any record to challenge the hardship declaration. Rather than due process, the CDC Order provides is "no process at all." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

The Supreme Court recently recognized when confronted with New York's similar scheme, it is *indisputably clear* that an eviction moratorium violates due process when the government permits tenants to halt eviction proceedings by merely self-certifying their own financial hardship. *Chrysafis v. Marks*, No. 21-1493, 2021 WL 3560766 (Aug. 12, 2021) (per curiam). According to the Court, such a scheme "violates the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause." *Id.* at *1 (quoting *In re Murchison*, 349 U.S. 133, 136 (1952)); (citing *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993) (due process generally requires a hearing)).

Even though the Order is only temporary (if CDC does not continue to extend and re-extended in perpetuity), the Supreme Court has made clear that "temporary or partial impairments to property rights … are sufficient to merits due process protection." *Doehr*, 501 U.S. at 12; *cf. also Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972) ("[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in terms of the Fourteenth Amendment."). Indeed, the New

York moratorium that the Supreme Court just enjoined in *Chrysafis* was set to expire within three weeks of the Court's summary injunction. *See* 2021 WL 3560766, at *2 (Breyer, dissenting).

Because CDC's Order permits tenants nationwide to shutdown eviction processes by self-certifying the CDC-provided declaration—without permitting Plaintiffs to confront their tenants in court to challenge the veracity of that declaration—the Order has deprived Plaintiffs of their property without the due process of law. This Court must hold that the Order is unlawful and enjoin its enforcement. *See* 5 U.S.C. § 706(2)(B).

## B. The CDC Order Violates Plaintiffs' Right to Access the Courts

Plaintiffs have a constitutional right "to seek legal redress for wrongs reasonably based in law and fact." *Harer v. Casey*, 962 F.3d 299, 306 (7th Cir. 2020); *see also Christopher v. Harbury*, 536 U.S. 403, 415 & n.12 (2002) ("However unsettled the basis of the constitutional right of access to courts, our cases rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."). *See generally* U.S. Const. amend. I (Petition Clause) ("Congress shall make no law … abridging … the right of the people … to petition the government for a redress of grievances.").

As the Supreme Court recognized more than 100 years ago:

> The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship, and must be allowed by each state to the citizens of all other states to the precise extent that it is allowed to its own citizens. Equality of treatment in this respect is not left to depend upon comity between the states, but is granted and protected by the Federal Constitution.

*Chambers v. Balt. & Ohio R.R.*, 207 U.S. 142, 148 (1907).

The right is grounded in Article IV's Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth and Fourteenth Amendment Due Process Clauses and the Fourteenth Amendment's Equal Protection Clause. *See Christopher*, 536 U.S. at 415 n.12. Regardless of the specific

source, citizens have a fundamental right of "access to the courts." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *accord Christopher*, 536 US. at 414.

Plaintiffs in this case are provided for judicial redress by the laws of their respective states. Indeed, nearly every state requires a landlord to use its processes rather than relying on self-help to repossess property from a tenant. In Iowa, for example, a home provider can evict a tenant for non-payment of rent upon three days' notice to the tenant. IA Code § 562A.27. The home provider must pay an $85 filing fee and serve the tenant at least three days prior to the eviction hearing. IA Code § 648.5. A hearing must be held within 15 days of the filing of the Complaint. *Id.* If the Court issues a writ of eviction, the tenant receives an order to leave within 3 days; subsequent to that, tenants are forcibly removed by the sheriff. IA Code § 648.22. Iowa, like all but perhaps two states, prohibits "self help" evictions by a forcible entry and detainer statute. IA Code § 648.1. It does this specifically to deter the violence that occurred under the previous regime. *Capital Fund 85 Ltd. P'ship v. Priority Sys., LLC,* 670 N.W.2d 154, 159 (Iowa 2003). Yet, the CDC Order deprives Plaintiffs of these state-court processes, as guaranteed by the federal Constitution.

Typically, claims of denial of access to the courts involve "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Christopher*, 536 U.S. at 413. Such a claim "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415. When a government official erects barriers that constitute a "complete foreclosure of relief" for a valid underlying action, the government has denied a plaintiff's right to access the courts. *Harer*, 962 F.3d at 311-12. After all, "[o]f what avail is it to the individual to arm him with a panoply of constitutional rights if, when he seeks to vindicate them, the courtroom door can be hermetically sealed against him by a functionary who, by refusal or neglect, impedes the filing of his papers?" *McCray v. Maryland*, 456 F.2d 1, 6 (4th Cir. 1972).

The most famous access-to-courts case is also the most applicable here. In *Boddie v. Connecticut*, 401 U.S. 371, 372, 374, 380 (1971), the Supreme Court invalidated a state law requiring prepayment of filing fees for divorce proceedings because it foreclosed the "sole means … for obtaining a divorce" for indigent litigants. "[G]iven the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving [the marriage] relationship" "due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." *Id.* at 374; *see also Christopher*, 536 U.S. at 413 (citing *Boddie* as an access-to-courts case).

The *Boddie* decision ensures that classes of litigants are not locked out of the courthouse. Thus, a law requiring a litigant to post a bond to access a trial in a court of record was invalid, because it was "the only effective means of resolving the dispute at hand." *Lecates v. Justice of Peace Court No. 4 of State of Del.*, 637 F.2d 898, 908 (3d Cir. 1980) (citation omitted). So too was a public school barred from requiring a tenured teacher to pay for the costs of a disciplinary proceeding, as there was no way for a teacher to "exercise" his rights "other than in a manner penalizing those seeking to assert it." *Rankin v. Indep. Sch. Dist. No. I-3, Noble Cty., Okl.*, 876 F.2d 838, 841 (10th Cir. 1989). Moreover, courts have recognized that the constitutional guarantee does not rely "solely on the fundamental nature of the marriage relationship" but instead turns on whether "(1) resort to the courts is the sole path of relief, and (2) governmental control over the process for defining rights and obligations is exclusive." *Lecates*, 637 F.2d at 908-09. Indeed, even a limited property interest in continuing employment as a teacher was of equal weight as the interest in obtaining a divorce in *Boddie*. *See Rankin*, 876 F.2d at 841.

Here, the CDC Order has unlawfully stripped Plaintiffs of their constitutional right to access the courts. Plaintiffs each have a valid lease agreement and have provided habitable premises to their tenants. If not for CDC's Order, Plaintiffs would be fully entitled to have their tenants ejected from their properties so that they could either use them or seek rent from solvent tenants. Plaintiffs have

therefore met the initial requirement of showing the merit of their underlying claims. *See Christopher*, 536 U.S. at 413.

Moreover, the Order constitutes a "complete foreclosure of relief" because it denies Plaintiffs the *only* lawful means of regaining possession of their property. *See Harer*, 962 F.3d at 311-12. Mr. McConkie, for instance, would ordinarily be entitled to terminate the rental agreement and retake possession through eviction proceedings for his tenant's nonpayment. Va. Code §§ 55.1-1245(f), 55.1-1251. But court proceedings are a Virginia landlord's *sole* means of reacquiring possession of his residential property. A sheriff must enforce a writ of eviction. *See* Va. Code § 8.01-470 (writs of eviction generally). A residential landlord is forbidden from taking possession of his own property. Va. Code § 55.1-1252. In fact, "[i]f a landlord unlawfully removes or excludes a tenant from the premises … the *tenant* may obtain an order from a general district court to recover possession, require the landlord to resume any such interrupted essential service, or terminate the rental agreement and, in any case, recover the actual damages sustained by him and reasonable attorney fees." Va. Code. § 55.1-1243(a) (emphasis added). Thus, "self help" evictions are unlawful in the Commonwealth and can themselves be prosecuted as an unlawful eviction. *See Evans v. Offutt*, 6 Va. Cir. 528, 1978 WL 208147, at *5 (Cir. Ct. Arl. Cty. 1978).

For Dennis and Roseanne Norton, the rules are largely the same. In North Carolina, when a landlord proves a tenant has breached his lease agreement by nonpayment of rent a magistrate "shall give judgment that the defendant be removed from, and the plaintiff be put in possession of, the demised premises[.]" N.C. Gen. Stat. § 42-30. Before executing a writ of possession, a sheriff must provide the tenant with at least five days' notice. N.C. Gen. Stat. § 42-36.2(a). "It is the public policy of the State of North Carolina, in order to maintain the public peace, that a residential tenant shall be evicted, dispossessed or otherwise constructively or actually removed from his dwelling unit only in accordance with the procedure" set out in the law. N.C. Gen. Stat. § 42-25.6. Since 1981, North

Carolina has "prohibited" "all self-help evictions in residential tenancies." *Stanley v. Moore*, <u>454 S.E.2d 225, 228</u> (N.C. 1995).

In South Carolina, where Mr. Tracy Mills and Equity Trust Co. rent properties, a landlord must also utilize a court eviction process and obtain a writ of ejectment from judge. *See* S.C. Code § 27-40-710. The writ must be executed by a state official, and a landlord may not attempt to evict a tenant through self-help. S.C. Code § 27-40-760. A landlord is also liable to a tenant for the greater of three months' rent or twice actual damages for an unlawful ouster if he attempts to evict a tenant outside the court process. S.C. Code § 27-40-660.

Likewise, in Mr. Rhett Butler's home state of Georgia, he and his LLC, Butler Plantations, must also use court eviction proceedings, and only permits eviction by a sheriff, constable or marshal's execution of a writ of possession. *See* Ga. Code § 44-7-55(d). Without being issued such a writ, a landlord may not retake possession of her residential property. *See id.* A landlord who resorts to self-help evictions faces criminal punishment. *See* Ga. Code § 44-7-14.1.

This process is the same in essentially the same form across the country. "[T]he growing modern trend holds that self-help is never available to dispose of a tenant." Shannon Dunn McCarthy, *Squatting: Lifting the Heavy Burden to Evict Unwanted Company*, 9 U. Mass. L. Rev. 156, 178 (2014). "Most states have eliminated the ability of homeowners to use self-help in the residential housing context." *Id.* Thus, eviction proceedings are the sole means for nearly all of NAA's and NARPM's member landlords to retake possession of their property.

The CDC Order has thus deprived Plaintiffs of their only path for recovery of their property. Because the "governmental control over the process for defining rights and obligations" for evictions "is exclusive," *see Lecates*, <u>637 F.2d at 908-09</u>, and the Order has closed the "only effective means of resolving the dispute at hand," *see Boddie*, <u>401 U.S. at 376</u>, Plaintiffs' rights to access the courts have been violated.

## III.     THE CDC ORDER IS ARBITRARY AND CAPRICIOUS

A court must set aside "arbitrary and capricious" agency action. 5 U.S.C. § 706(2)(A).   An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   Further, when an agency does not adequately explain its authority for a certain action, its actions are arbitrary and capricious.   *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1911-12 (2020).

In determining whether the agency acted arbitrarily and capriciously, a court asks if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."   *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.   "An arbitrary and capricious action is one in which: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."   *In re Operation of Missouri River Sys. Litigation*, 421 F.3d 617, 628 (8th Cir. 2005) (cleaned up).

The CDC Order is arbitrary and capricious because it has not demonstrated that local jurisdictions are taking "insufficient" measures to address Covid-19, even though 42 C.F.R. § 70.2 only grants CDC a measure of power when CDC properly "determines that the measures taken by the health authorities of any State … are insufficient to prevent the spread of any of the communicable diseases[.]"   Here, CDC merely asserts that because a nationwide halt to evictions could **help reduce** spread of the disease, jurisdictions "that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19."   86 Fed. Reg. at 43,251.   The Order, and

its administrative record, fail to demonstrate how the mitigation efforts in jurisdictions allowing evictions are an "insufficient" response to the disease. All CDC offers is a tautology. "[C]lassical circular reasoning … must be set aside as arbitrary and capricious." *Kelly v. United States*, <u>34 F. Supp. 2d 8, 14</u> (D.D.C. 1998).

CDC has also failed to catalogue in the Order itself or anywhere in the administrative record for that matter the efforts taken by *any* jurisdiction to combat Covid-19. Nor has it explained why allowing eviction proceedings, more than any other aspect of prevention strategies, represents the line that states may not cross. Nor has CDC cited *any* evidence that any infection has arisen because of an eviction proceeding, let alone evidence that evictions in general pose a significant danger to the public. "Nothing remotely approximating a factual finding lurks in the Board's decision." *Id.* at 13.

CDC's secondary conclusion, that an eviction moratorium is "necessary" to stop the spread of Covid-19 is unsupported by evidence, and CDC has abjectly failed to stop the spread of Covid-19 to all 50 states. CDC made no findings that any significant portion of evicted tenants would travel interstate. *Terkel v. CDC*, <u>2021 WL 742877</u>, at *7-8 (E.D. Tex. Feb. 25, 2021). The CDC Order "applies without regard to whether an evicted tenant would move to a new city, much less a new state." *Id.* at *8. Moreover, "[t]he order applies without regard to a tenant's infection with, prior exposure to, or vaccination against COVID-19." *Id.*

In fact, CDC is careful never to actually say that the moratorium is necessary—the best it can do is say that "[i]n the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease." <u>86 Fed. Reg. at 43,247</u>. But even this tepid statement lacks any real evidentiary support. CDC relies instead on hyperbolic reasoning—saying that "mass evictions" and "homelessness" **might** increase the likelihood of Covid-19, and thus that that the **only** appropriate course of action is to halt evictions nationwide. *See Id.* at 43251-52. CDC does not explain sufficiently why this would be so or

why other less-drastic remedial measures are inadequate.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Pillai v. CAB*, 485 F.2d 1018, 1027 (D.C. Cir. 1973) ("[T]he Board's discussion is a recital of conclusions, not facts, and of conclusions with little supporting rationale visible.  As a reviewing court we are thus placed in the position of either accepting, on the basis of sheer faith in the Board's 'expertise,' the unsupported conclusions, or of vacating the order and remanding for reexamination and creation of a record relevant to what the Board has clearly designated the decisive issue.").

CDC does not explain why it chose $99,000 dollars as the amount a person could make and still not pay rent.  This threshold is arbitrary and capricious, as many tenants could be making more than their home providers and still not pay rent.  Nor does CDC explain why a person evicted for breaching their lease in a different manner than non-payment of rent—for instance, breaching a lease by housing persons who are not identified on the lease—would not cause the spread of Covid-19 in the way it purports that evictions for non-payment of rent would.  CDC cannot explain how a tenant evicted for failure to pay rent is likely to spread Covid-19 over state lines but a tenant evicted for destruction to property or some other violation of the lease is not.  An agency cannot adopt one policy alternative but then, in effect, apply a different one; this is "the essence of arbitrary and capricious action."  *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978), *applied in New England Coal. On Nuclear Pollution v. NRC*, 727 F.2d 1127, 1130 (D.C. Cir. 1984); *cf. Phillips v. Iowa*, 185 F. Supp. 2d 992, 1011 (N.D. Iowa 2002) ("the inclusion of second-degree robbery is arbitrary and capricious because it is underinclusive").  Moreover, CDC also does not explain why a person who has bought and maintained a property must bear the costs and burdens of a rental agreement and be denied access to state courts for evictions.  Yet, if because of the Eviction Moratorium and the lack of funds it creates an owner of a property is foreclosed upon, the banks can evict the same tenant!

If CDC's concern were truly to stop the spread of Covid-19 among the unhoused, CDC could provide vaccines to those at risk of homelessness. The evidence simply fails to support CDC's Order, and it is thus arbitrary and capricious.

## IV.     IN THE ALTERNATIVE, CDC'S ORDER VIOLATES THE NONDELEGATION DOCTRINE

In the alternative, the APA requires this Court to hold unlawful and set aside the Order because it violates the nondelegation doctrine and is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Both the Supreme Court and the other courts that have examined this issue touch on a troubling problem if the CDC's Eviction Moratorium is upheld as within its power to enact: What is the limiting principle?

In *AAR v. HHS*, the Supreme Court noted that if it agreed with the Government's position "It is hard to see what measures this interpretation would place outside the CDC's reach and the Government has identified no limit in § 361(a) beyond the requirement that the CDC deem a measure "necessary." 2021 WL 3783142, at *3; *and see AAR I*, at * 7 ("An overly expansive reading of the statute would raise serious constitutional concerns, as other courts have found."); *see also Tiger Lily*, 5 F.4th at 672 ("'[T]o put extra icing on a cake already frosted,' the government's interpretation of § 264(a) could raise a nondelegation doctrine.") (citations omitted). *See Tiger Lily v. United States HUD*, __ F. Supp. 3d __, 2021 WL 1171887, at *9 (W.D. Tenn. Mar. 15, 2021) (reasoning that CDC's interpretation of § 264(a) reads out the statute's intelligible principle).

Article I, § 1 of the U.S. Constitution states, "*All* legislative Powers herein granted shall be vested in a Congress of the United States." (Emphasis added). The grant of "[a]ll legislative Powers" to Congress in the Vesting Clause means that Congress may not divest "powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. 1, 42-43 (1825). Whether federal legislation effects a permissible or prohibited delegation of legislative powers—and thus violates the Article I, § 1 Vesting Clause—is determined based on whether the legislation provides "an intelligible principle" to

which an administering agency is directed to conform when carrying out its functions under the legislation and if it fails to provide such guiding principle it violates the Vesting Clause. *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also Gundy v. United States*, 139 S. Ct. 2116, 2148 (2019) (Gorsuch dissenting) ("In a future case with a full panel, I remain hopeful that the Court may yet recognize that, while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code. That 'is delegation running riot.'"). Here, it is not even the chief prosecutor but the non-Senate confirmed head of the CDC writing her own criminal code.

Because § 264(a), as interpreted by CDC, would fail to include an intelligible principle that imposes limits on CDC's alleged regulatory authority it would violate the non-delegation doctrine if the statute was not already found to exceed the Defendants legitimate authority.

## CONCLUSION

For the reasons set out above, the Court should enter a summary judgment in favor of the Plaintiffs, declare that the CDC Order is unlawful, and enjoin Defendants from enforcing that Order.

Dated: August 30, 2021

Respectfully,

/s/    John J. Vecchione
John J. Vecchione (*pro hac vice*)
Senior Litigation Counsel
Jared McClain (*pro hac vice*)
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
John.Vecchione@ncla.legal
Jared.McClain@ncla.legal
(202) 918-6902
*Counsel for Plaintiffs*

/s/
The Kirkwood Institute, Inc.
Alan R. Ostergren

*President and Chief Counsel*
500 Locust Street, Suite 199
Des Moines, Iowa 50309
alan.ostergren@kirkwoodinstitute.org
(515) 207-0134

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2021, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ John J. Vecchione
John J. Vecchione
*Counsel for Plaintiffs*